**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CORNERSTONE RESIDENCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-706 |
| | ) | Judge Nora Barry Fischer |
| THE CITY OF CLAIRTON, | ) | |
| PENNSYLVANIA and GEORGE | ) | |
| GLAGOLA, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

In this action, Plaintiff Cornerstone Residence, Inc., ("Cornerstone"), alleges that Defendants, the City of Clairton, ("Clairton") and one of its zoning officers, George Glagola, ("Glagola"), violated the Fair Housing Amendments Act, ("FHAA"), by denying its application for a certificate of occupancy to run a sober house in a residential zone within Clairton. (Docket No. 20). Cornerstone further asserts that certain provisions of Clairton's Zoning Ordinance facially violate the FHAA by allegedly excluding disabled individuals from residing in residential zones. (*Id.*). Defendants seek dismissal of Cornerstone's Amended Complaint, arguing that its FHAA claims are subject to dismissal under Rule 12(b)(1) because they not ripe for adjudication as the denial of the application by the zoning officer was not appealed to the Zoning Hearing Board or resubmitted as Cornerstone was directed. (Docket Nos. 22; 23; 27). Defendants further maintain that Cornerstone's claims are also subject to dismissal under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. (*Id.*). Aside from conceding its official capacity claim against Glagola, Cornerstone opposes the motion. (Docket Nos. 24; 30). Cornerstone separately seeks a preliminary injunction on its claim seeking to

1

invalidate certain provisions of Clairton's Zoning Ordinance and Defendants contest such motion, on largely the same grounds articulated in their motion to dismiss. (Docket Nos. 31-33; 35; 38; 41). As the competing motions have been fully briefed, they are now ripe for disposition. (Docket Nos. 22-24; 27; 30; 31-33; 35; 38; 41). After careful consideration of the parties' arguments and for the following reasons, Defendants' Motion to Dismiss [22] will be granted and Cornerstone's Motion for a Preliminary Injunction [31] will be denied, as moot.

## II. BACKGROUND

### A. *Cornerstone Residence, Inc.*

Cornerstone "is a Pennsylvania non-profit corporation established to own and operate supportive residency for men recovering from addiction to alcohol and/or drugs." (Docket No. 20 at 1, ¶ 4). Joyce Douglass is the president and executive director of Cornerstone. (*Id.* at ¶¶ 12). She previously served as a Pennsylvania Board of Probation and Parole Agent for twenty-five years, and during twenty-one of those years she was assigned to the Clairton area. (*Id.* at ¶ 12; Docket No. 20-1, Ex. "B"). During her tenure as a parole agent, Douglass observed the problems that ex-offenders faced with drug and alcohol addictions and noticed "a lack of sound residential options to support their recovery." (Docket No. 20 at ¶ 13). She researched different residential models and became aware of those that were the most successful. (*Id.*). After Douglass retired in May of 2015, she started pursuing the Cornerstone business full-time. (*Id.*).

In the fall of 2015, Douglass met with Clairton Mayor Richard Lattanzi and discussed the purported need for a "family-like residential facility in Clairton which would provide essential support to those who have been involved with the criminal justice system principally with drug or alcohol addiction." (Docket No. 20 at ¶ 14). Mayor Lattanzi expressed support for the project and suggested various sites to Douglass, who then investigated the recommended sites and other

locations. (*Id.* at ¶¶ 15-16). Ultimately, Douglass determined that the site at 622 Delaware Avenue in Clairton was the only "suitable" option for her business. (*Id.* at ¶¶ 17-19, 23-24). Cornerstone claims that Mayor Lattanzi agreed that this location was "acceptable" but continued to show her other possible locations within the City limits. (*Id.* at ¶¶ 23-24).

Douglass sent a lengthy letter to Mayor Lattanzi and the Clairton City Council dated December 10, 2015. (Pl. Ex. B, Docket No. 20-2). In the letter, she describes her background as a parole officer and notes problems that she believes many parolees have reintegrating into the community, including issues with local halfway houses such as overcrowding, a lack of certain programming she believes would be beneficial and other support. (*Id.* at 2). She states that she would "like to open a residential setting for offenders that would house appropriately 15 residents." (*Id.*). Douglass continues that "[t]his establishment would offer a safe secure environment for offenders who are serious about changing their lives. My hope, also, is to offer some types of rehabilitative services, or training in the church area." (*Id.*). She mentions drug and alcohol counseling, job training and other types of reentry programming that she plans to provide to the residents. (*Id.*). She adds that the location she has chosen is 622 Delaware Avenue. (*Id.*). In closing, Douglass points out that she is aware that there may be some public opposition to her project but asks the Mayor and City Council to consider and support her plans. (*Id.*).

### B. Delaware Avenue Property

The Delaware Avenue property is the former site of Saint Paulinis Roman Catholic Church and consists of at least two buildings, i.e., a church; and a residence/rectory. (Docket No. 20 at ¶¶ 17). The Church was closed by the Diocese of Pittsburgh in 2007. (*Id.* at ¶ 22). The rectory was last occupied approximately three years ago (i.e., around 2014) by a pastor of a

nearby church. (*Id.* at ¶ 21). The site is located in a residential zoning district within the City of Clairton. (*Id.* at ¶ 20). Cornerstone avers that the location is "on the fringe of a single family residential neighborhood" but that "[c]ommercial uses are also immediately proximate." (*Id.*).

Cornerstone initiated negotiations with the Diocese of Pittsburgh to purchase the property at some point in late 2015 or early 2016. (Docket No. 20 at ¶ 25). Cornerstone made an offer which was acceptable to the Diocese and the Finance Council of Saint Claire of Assisi Parish approved the terms. (*Id.* at ¶ 27). An agreement of sale was executed between Cornerstone and the Diocese on March 31, 2017. (*Id.* at ¶¶ 27-28). The terms of the agreement include a 270-day zoning approval contingency, meaning that the agreement will expire at the end of 2017 if the zoning is not approved. (*Id.* at 28).

### C. Meeting With City Officials and Zoning Proceedings

At some point prior to the execution of the agreement of sale, Douglass "modified her intentions for the property to include only those with drug or alcohol addictions in need of stable housing to support their recovery and to not limit occupants to those who were or had been involved in the criminal justice system." (Docket No. 20 at ¶ 26). After she completed the deal with the Diocese, Douglass requested a meeting with City officials for the purpose of explaining in more detail the intended use and to seek their support. (*Id.* at ¶ 29). She also wanted to address the previously expressed opposition to her proposal held by some in Clairton that "heroin is not a sickness, it is a choice and Clairton is trying to get drug users out, not bring them in." (*Id.* at ¶ 30). The meeting was held on April 4, 2017 with unnamed council members, the City Manager and City Solicitor in attendance. (*Id.* at ¶ 32).

On April 20, 2017, Cornerstone submitted a formal application to Clairton requesting that a certificate of occupancy issue for its use of the rectory building on the property as a "single

family dwelling." (Docket No. 20 at ¶ 32).  The following explanation was included as an attachment:

> Attachment to application for single family dwelling occupancy permit.
>
> This application pertains to the residential structure (a former residence for clergy) on the premises. The church structure on the premises will not be presently used.
>
> Cornerstone Residency is a sober living residence for men recovering from addiction to alcohol and/or drugs.
>
> To qualify for Cornerstone, individuals must have been and be actually addicted to drugs or alcohol, must be in recovery, and must be unable to live independently or with their families without suffering a relapse. These individuals suffer from a physical or mental impairment which substantially limits one or more major life activities including their ability to live independently and their ability to work. This determination will be made prior to residency.
>
> Cornerstone's role is to provide a single family dwelling and ensure that all residents are in recovery, in need of this residence to support their recovery and are meeting residence standards including that residents are living together as a family and providing needed support for each other. Residents have their own bedrooms and share all other living spaces, responsibilities and activities. As this addiction is lifelong, their residency is expected to be for a substantial period or permanent.

(Docket No. 20-1).  The parties agree that this application for a certificate of occupancy was denied by Clairton.  However, they dispute when and why the application was denied.

Cornerstone alleges that Douglass and Glagola had discussions about this application; an inspection was initially scheduled; but Glagola sent an email to Douglass on May 1, 2017, cancelling the inspection and stating "that is not a permitted use in that zoning district.  The city is in the process of responding to the application."  (Docket No. 20 at ¶¶ 33).  In reply, Douglass requested that an inspection be conducted, reiterating that the application was for the rectory only and did not include the church building. (*Id.* at ¶¶ 34).

Glagola once again denied this request. (*Id.* at ¶¶ 35). Cornerstone contends that the reason for the denial was that Glagola and Clairton officials determined that the proposed use was a "Treatment Center" under the Zoning Ordinance, which, as is explained below, is not a permitted use in the location of the rectory. Cornerstone submits that this interpretation is supported by the December 2015 letter which Douglass sent to City officials. (Pl. Ex. B, Docket No. 20-2).

Defendants have a different view. They point to the letter that Glagola sent Douglass/Cornerstone a letter dated May 30, 2017 wherein he states that Clairton referred the application to the "City Building Code Official for review under the Commonwealth Uniform Construction Code Standard (PA UCC)." (Docket No. 23-1). Glagola concludes that he is "returning the original copy [of the application] to you, but I have submitted a copy of such to the Building Code Official for reference. Once approved by the BCO, please feel free to resubmit to the Clairton Zoning Department for further action." (*Id.*). In further correspondence dated May 30, 2017, the Building Code Official, Craig I. McVicker, writes to Douglass/Cornerstone that the application "has been denied for occupancy purposes relevant to the Commonwealth UCC Section 403.27 & 28 Uncertified Structure," cites the relevant provisions, and concludes that Cornerstone was required to submit an engineering report in support of the application. (Docket Nos. 20 at ¶ 46; 20-3, Pl. Ex. "C").

Although Cornerstone disagreed that an engineering report was required, it subsequently obtained one from Gary J. Miller, Structural Engineering Services, which is dated June 10, 2017 and notes that the building has been deemed "structurally adequate" and submitted same to Clairton. (Docket Nos. 20 at ¶¶ 47-48; 20-4, Pl. Ex. "D"). However, Cornerstone admits that it has taken no further action with respect to its application, including that it did not appeal the

denial of the application to the Zoning Hearing Board. (*See* Docket No. 24 at 2, n.1 ("Plaintiff does not dispute that an appeal to the Clairton Zoning Hearing Board was not filed following the Zoning Officer's denial of its occupancy permit application.")). Cornerstone is not presently operational because the deal with the Diocese has not closed and it does not have a facility for its sober house.

### D. Pertinent Zoning Provisions

Clairton is divided into a number of different zoning districts and its Zoning Ordinance regulates the "use" of properties or the "purpose for which land or a building is arranged, designed or intended or for which land or a building is or may be occupied or maintained" in each of those zoning districts. *See City of Clairton, Zoning Ordinance ("Zoning Ordinance")* at § 337-12 (enacted 7/8/14).[1] The former parish rectory at issue in this case is zoned R-2, which is a medium density residential zoning classification. *Id.* at § 337-14. Relevant here, Clairton's ordinances provide the following regarding specific uses in the R-2 zone: (1) a single family dwelling is a permitted use; (2) a "group home" is a conditional use, subject to approval by the Zoning Hearing Board; and, (3) a "treatment center" is not permitted in a residential zone. *See id.* at Table 301. The Zoning Ordinance separately defines each of these "uses." *Id.* at 337-12.

To this end, a single family detached dwelling is defined as "[a] building occupied by only one dwelling unit, and having no party wall in common with an adjacent building." *Zoning Ordinance* at § 337-12. A "dwelling unit" is "[o]ne or more living or sleeping rooms with cooking and sanitary facilities for one person or one family." *Id.* Finally, a "family" is defined as:

---

[1]     The Court notes that various excerpts of the Zoning Ordinance are filed along with the parties' submissions but the entire Zoning Ordinance is filed as an attachment to Plaintiff's brief in opposition. (*See* Docket No. 24 at 14-135).

[o]ne or more individuals who are "related" to each other by blood, marriage or adoption (including persons receiving formal foster care) or up to 5 unrelated individuals who maintain a common household with common cooking facilities and certain rooms in common, and who live within one dwelling unit. **The foregoing restrictions do not apply to persons with disabilities as defined in the Fair Housing Act, 42 USC § 3601 et seq.**

*Id.* at 337-12 (emphasis added).

A "Group Home" constitutes the following:

A dwelling unit operated by a responsible individual, family or organization with a program to provide a supportive living arrangement for individuals where special care is needed by the persons served due to age, emotional, mental, developmental or physical disability. **This definition shall expressly include facilities for the supervised care of persons with disabilities subject to protection under the Federal Fair Housing Act as amended.** Group Homes must be licensed where required by any appropriate government agencies, and a copy of any such license must be delivered to the Zoning Officer prior to the initiation of the use. A Group Home typically involves an individual residing on the premises for more than 30 days at a time.

(a) Group Homes shall be subject to the same limitations and regulations by the City as the type of dwelling unit they occupy.
(b) **It is the express intent of the City to comply with all provisions of the Federal Fair Housing Act, as amended, and regulations promulgated thereunder, in the construction of this term.**
(c) A Group Home shall not include a "Treatment Center."

*Id.* at 337-12 (emphases added). The Zoning Ordinance provides the following additional regulations of Group Homes:

**T. Group homes**
1. Shall not be located on lots of less than six thousand (6,000) square feet, nor on lots having less than four hundred (400) square feet for every sleeping room or for every two (2) beds, whichever is greater.
2. Such uses shall have side yards of not less than ten (10) feet.
3. Shall not be approved unless plans prepared by an architect or

engineer are submitted which clearly indicate that adequate light, ventilation and fireproofing are provided and that the dwelling facility and its accommodations shall be functional and convenient with regard to the specified needs of the group to be housed in the facility.

4. Group homes shall be approved only after the Council has found that plans and programs for management of the group residence or facility are adequate and appropriate to the population to be housed and that adequate provisions have been made to assure the safety and welfare of the residents of the facility and of the adjacent neighborhood.

5. A group residential facility shall not include business or professional offices (other than incidental offices), business activities, fraternal or social clubs, hospitals, clinics or other such activities.

6. On-site parking facilities shall be provided at the ratio of one (1) off-street space for every two (2) full-time staff members, one (1) additional space for every non-staff resident permitted by the sponsor to operate a motor vehicle, plus two (2) additional spaces.

7. A license or certification shall be obtained from the Commonwealth of Pennsylvania or the county, if applicable, prior to the issuance of a certificate of occupancy. In the event that an appropriate licensing or certifying agency does not exist, the applicant shall demonstrate to the governing body that the proposal for establishing such a facility satisfies a demonstrated need and will be conducted in a responsible manner.

8. Such facilities require annual fire safety inspections, to be provided by the City.

9. In addition to the above requirements, Group homes shall also meet the requirements of Chapter 263, Personal Care Residence Homes.

*Id.* at § 337-37-(T).

A "Treatment Center" is described in the Zoning Ordinance as:

A use involving any one or a combination of the following:

(1) A use (other than a prison or a hospital) providing housing for three or more unrelated persons who need specialized housing, treatment and/or counseling because of:

(a) Criminal rehabilitation, such as a criminal halfway house, or a facility for the housing of persons judged to be juvenile

9

delinquents, or a criminal work release or prerelease facility;

(b) Current addiction to a controlled substance that was used in an illegal manner or alcohol;

(c) A type of mental illness or other behavior that causes a person to be a threat to the physical safety of others.

(2) A residential or nonresidential methadone treatment facility, which shall be defined as a facility licensed by the Pennsylvania Department of Health, other than a hospital, to use the drug methadone in the treatment, maintenance or detoxification of persons.

(3) A lot upon which reside two or more persons who are required to register their place of residence with the Pennsylvania State Police as a requirement of the Pennsylvania Megan's Law II, or its successor law, as amended.[…]

(4) A use that otherwise meets the definition of a "group home," except that it includes a higher number of residents than is allowed in a group home.

*Id.* at 337-12. The Zoning Ordinance adds the following regarding Treatment Centers:

**PP. Treatment Center (includes methadone treatment center).**
1. The applicant shall provide a written description of all conditions (such as criminal parolees, alcohol addiction) that will cause persons to occupy the use during the life of the permit. Any future additions to this list shall require an additional conditional use approval.
2. The applicant shall prove to the satisfaction of the City Council that the use will involve adequate on-site supervision and security measures to protect public safety. If any applicable County, State, Federal or professional association standards provide guidance on the type of supervision that is needed, the proposed supervision shall be compared to such standards.
3. City Council may place conditions upon the use to protect public safety, such as conditions on the types of residents and security measures.
4. A methadone treatment center or other drug treatment center or a use involving housing of 2 or more persons required to register their place of residence under Megan's Law II shall be setback a minimum of 500 feet from each of the following: a primary or secondary school, a park or playground, or a child day care facilities.
5. See also Section 337-27G.

*Id.* § 337-37-(PP).

The Zoning Ordinance also sets forth directives as to the submission of applications and decisions as to same. *See Zoning Ordinance* at art. VI: Administration & Enforcement. Relevant here, Zoning Officers are charged with reviewing and approving occupancy permits. *Id.* at § 337-39. An adverse decision by a Zoning Officer may be appealed to the Zoning Hearing Board, which is granted the authority to hold hearings and to "render final adjudications" on the application. *Id.* at § 337-49-(A)-(B).

### E. Relevant Procedural History

Cornerstone initiated this lawsuit by filing its original Complaint on May 31, 2017. (Docket No. 1). Thereafter, it filed motions for a preliminary injunction and to expedite discovery on June 20, 2017, (Docket Nos. 7, 8, 9), both of which were summarily denied by the Court for procedural defects, including its failure to confer with Defendants prior to seeking such relief, as is required under this Court's Practices and Procedures. (*See* Docket No. 10). Defendant responded to the Complaint by filing a motion to dismiss and supporting brief on June 23, 2017. (Docket Nos. 12, 13). Cornerstone immediately renewed its motions for preliminary injunction and expedited discovery. (Docket Nos. 14, 15, 17). The Court once again summarily denied Cornerstone's motions, for the reasons previously stated and added that it would exercise its discretion to address Defendants' jurisdictional challenge to the ripeness of Cornerstone's claims prior to proceeding to litigate the injunction and discovery matters. (Docket No. 19). Rather than responding to the motion to dismiss, Cornerstone submitted an Amended Complaint pursuant to Rule 15(a)(1)(B) on July 13, 2017. (Docket No. 20).

Defendants filed the pending motion to dismiss and their supporting brief on July 27, 2017, renewing both their jurisdictional challenge to Cornerstone's claims and their arguments

that the Amended Complaint fails to state a claim upon which relief may be granted. (Docket Nos. 22, 23). Cornerstone responded with its brief in opposition on August 4, 2017. (Docket No. 24). Defendants submitted their reply brief on August 18, 2017. (Docket No. 27). Cornerstone countered by filing its sur-reply brief on August 25, 2017. (Docket No. 30).

Cornerstone filed another motion for preliminary injunction on September 18, 2017, along with a supporting brief and attached exhibits. (Docket Nos. 31; 32). Defendants countered with their response on September 28, 2017. (Docket No. 36). The Court granted Cornerstone leave to file a reply brief and submit affidavits[2] in support, which it did on October 5, 2017. (Docket No. 38). The Court likewise permitted Defendants to respond by way of a sur-reply, which was filed on October 10, 2017. (Docket No. 41).

The pending motions have been fully briefed and they are now ripe for disposition.

### III. LEGAL STANDARDS

The parties' motions under Rules 12(b)(1), 12(b)(6) and 65 are evaluated pursuant to different legal standards, each of which the Court sets forth below.

#### A. Motion to Dismiss – Rule 12(b)(1)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's subject-matter jurisdiction over the plaintiff's claims. Fed. R. Civ. P. 12(b)(1). "At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the case.'" *Judkins v. HT Window Fashions Corp.*, 514 F. Supp. 2d 753, 759 (W.D. Pa. 2007) (quoting *Mortensen v. First Fed. Sav.*

---

[2] Cornerstone submitted six unsworn declarations from the following individuals in support of its motion for preliminary injunction: Joyce Douglass, Executive Director, Cornerstone; Leo Hutchinson, who operates a number of sober houses in the area; Kristen Hall, who also operates a number of sober houses; Torie Stimaker, a recovering addict; Tim Grealish, an intervention specialist; and counsel Donald Driscoll, explaining the efforts made to resolve the matter with Defendants. (Docket Nos. 38-1: 38-6). It is the Court's opinion that these statements are not relevant to the instant decision dismissing certain of Cornerstone's claims challenging the denial of the application as unripe under Rule 12(b)(1) and they otherwise constitute matters outside the pleadings such that they cannot be considered under Rule 12(b)(6). Further, as the motion for preliminary injunction has been denied based on the dismissal of the claims, the declarations are not summarized herein.

*and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). As the party asserting jurisdiction, the plaintiff bears the burden of showing that its claims are properly before the court. *Development Finance Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 158 (3d Cir. 1995). In reviewing a Rule 12(b)(1) motion, a court must determine whether the attack on its jurisdiction is a facial attack or a factual attack. A facial attack challenges the sufficiency of the plaintiff's pleadings. *Petruska v. Gannon Univ.*, 462 F.3d 294, 302, n. 3 (3d Cir. 2006). When considering a facial attack, a court must accept the allegations contained in the plaintiff's complaint as true. *Id.* A factual attack on the court's jurisdiction must be treated differently. *Id.* When considering a factual attack, the court does not attach a presumption of truthfulness to the plaintiff's allegations, and the existence of disputed material facts does not preclude the court from deciding for itself the jurisdictional issues raised in the motion to dismiss. *Mortensen*, 549 F.2d at 891.

### B. *Motion to Dismiss – Rule 12(b)(6)*

A court may dismiss a claim for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a Fed. R. Civ. P. 12(b)(6) motion, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

The plaintiff must plead "enough factual matter" to "'nudge [his or her] claims across the line from conceivable to plausible.'" *Phillips*, 515 F.3d at 234-35 (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 556, 570 (2007) (alteration in original)). All that is required is that the plaintiff's complaint "contain sufficient factual matter, accepted as true, to state a claim to relief

that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation omitted), in order to " 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,' " *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (alteration in original)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

When reviewing the sufficiency of a complaint, the trial court must undertake three steps. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.'" *Id.* (quoting *Iqbal*, 556 U.S. at 675) (alterations in original). "Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "[T]he clearest indication that an allegation is conclusory and unworthy of weight . . . is that it embodies a legal point." *Id.* at 790. "Finally, '[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* at 787 (quoting *Iqbal*, 556 U.S. at 679) (alterations in original).

### C. Motion for Preliminary Injunction – Rule 65

The grant or denial of preliminary injunction is within the sound discretion of the Court. *See American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). The primary purpose of preliminary injunctive relief "is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645,

647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The decision to issue a preliminary injunction is governed by a four-factor test, wherein Plaintiff must demonstrate:

> "(1) that [it is] reasonably likely to prevail eventually in the litigation and (2) that [it is] likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiff[…] and (4) whether granting relief would serve the public interest."

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)). In reaching its decision on the request for injunctive relief, the Court may receive evidence outside the pleadings. The Court also sits as both the arbiter of legal disputes and trier of fact and is therefore tasked with resolving factual disputes and assessing the credibility of witness testimony. *See e.g., Hudson Global Resources Holdings, Inc. v. Hill*, Civ. A. No. 07-132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007) ("A court considering whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing, and base its decisions on credibility determinations.").

## IV. DISCUSSION

The FHAA prohibits housing discrimination against handicapped individuals. 42 U.S.C. § 3604(f)(2). The FHAA provides, in relevant part, that it is unlawful:

> [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of-
> > (A) that person; or
> > (B) a person residing in or intending to reside in that

> dwelling after it is so sold, rented, or made available; or
> (C) any person associated with that person.

*Id.* "[C]ourts have specifically allowed claims under this section to be brought against municipalities and land use authorities," including challenges related to the discriminatory zoning of real property. *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005) (citing *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment*, 284 F.3d 442 (3d Cir. 2002)). A plaintiff alleging a violation of the FHAA can bring "three general types of claims: (1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make 'reasonable accommodations,' which arise under § 3604(f)(3)(B)." *Wind Gap Mun. Auth.*, 421 F.3d at 176.

In this case, Cornerstone primarily alleges that Defendants engaged in intentional discrimination in violation of the FHAA and has therefore set forth a purported disparate treatment claim. (Docket No. 20). The Third Circuit recognizes that "[t]o prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action." *Wind Gap Mun. Auth.*, 421 F.3d at 177. "The discriminatory purpose need not be motivated by hostility or animus towards a particular handicap, '[t]he plaintiff is only required to show that a protected characteristic played a role in the defendant's decision to treat [it] differently.'" *Oxford Investments, L.P. v. City of Philadelphia*, 21 F. Supp. 3d 442, 454-55 (E.D. Pa. May 15, 2014) (quoting *Wind Gap Mun. Auth.*, 421 F.3d at 177 which quoted *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)). A plaintiff can prove disparate treatment in one of two ways: through direct or circumstantial evidence of discriminatory animus; or by asserting that a facially discriminatory classification violates the FHAA. *See Wind Gap Mun.*

*Auth.*, 421 F.3d at 179-180.

Cornerstone also alleges a claim for disparate impact.[3] (Docket No. 20). Courts have recognized that:

> [t]o state a claim for disparate impact, "a plaintiff must prove that defendants' policies have a greater adverse impact on persons with disabilities than on non-protected persons." *Sharpvisions, Inc. v. Borough of Plum*, 475 F.Supp.2d 514, 525 (W.D.Pa. 2007). In such a claim, an outwardly neutral practice or law has a "significantly adverse or disproportionate impact on persons with disabilities." *Id.* "Typically, a disparate impact is demonstrated by statistics, and a prima facie case may be established where gross statistical disparities can be shown." *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (internal citations and quotations omitted).

*Oxford Investments, L.P.*, 21 F. Supp. 3d at 456–57.

The parties debate the scope of Cornerstone's claim, leading Defendants to move to dismiss the Amended Complaint on alternative theories of ripeness and failure to state a claim. Cornerstone naturally opposes dismissal of its Amended Complaint. The Court now analyzes the parties' positions with respect to each of these motions, in turn.

### A. Rule 12(b)(1) Motion – Ripeness

Defendants move to dismiss Cornerstone's claim for injunctive relief to the extent that it challenges the denial of the permit application by the Zoning Officer, Glagola. (Docket Nos. 22; 23; 27). In response, Cornerstone admits that it did not pursue an appeal to the Zoning Hearing Board and does not meaningfully contest that its disparate treatment claim is not currently ripe for judicial review. (Docket Nos. 24; 30). Rather, Cornerstone focuses on its purported facial

---

[3] The Court notes that Cornerstone does not set forth a separate count of disparate impact but uses the phrase in two paragraphs of its Amended Complaint. (*See* Docket No. 20 at ¶¶ 51 ("Alternatively, this Zoning Ordinance provision causes a disparate impact against disabled, non-related adults who are in recovery from drug or alcohol addiction and need specialized housing."); 57 ("57. The policies, practices and conduct of Defendants violate the rights of Cornerstone and those for whom its residency is intended, as secured by the FHA in both facially discriminating against the disabled and in causing a disparate impact against those who are not related and are disabled.").

challenge to the "Treatment Center" Ordinance and contends that this type of claim is not subject to the finality rule. (*Id.*). Having considered the parties' positions on this issue, the Court agrees that Cornerstone's claim for intentional housing discrimination arising from the denial of the application by the Zoning Officer and seeking injunctive relief is not ripe for review in this Court because Cornerstone refused to appeal that ruling to the Zoning Hearing Board, despite having an opportunity to do so. With that said, the Court agrees that the alleged facial challenge raises a ripe claim but discusses in the next section why that claim is subject to dismissal for other reasons.

As this Court recognized in *South Allegheny Pittsburgh Restaurant Enterprises ("SAPRE") v. the City of Pittsburgh, et al.*, Civ. A. No. 16-1393, 2016 WL 4962926, at *10 (W.D. Pa. Sept. 16, 2016), a decision which was provided to the parties at the outset of this litigation, (*see* Docket No. 19), the Third Circuit applies the "finality rule" of ripeness to land use and zoning decisions by local municipalities whereby:

> Constitutional challenges to land-use decisions under 42 U.S.C. § 1983 may not proceed unless the local authority has been given the opportunity to render a final decision regarding the challenged zoning ordinance. *See Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1290–91 (3d Cir. 1993). A property-owner "has a high burden of proving that a final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds." *Acierno v. Mitchell*, 6 F.3d 970, 975 (3d Cir. 1993) (internal citation omitted).

*SAPRE*, 2016 WL 4962926, at *10 (quoting *Harris v. Twp. of O'Hara*, 282 F. App'x. 172, 175–76 (3d Cir. 2008)). The Court of Appeals has applied the "finality rule" to a case alleging violations of the FHAA, articulating similar principles. To this end, in *Thompson v. Borough of Munhall*, a panel of the Court of Appeals noted that:

> Ripeness involves a determination as to the point in time at which a party may pursue a claim. *Philadelphia Fed'n of Teachers v.*

18

*Ridge*, 150 F.3d 319, 323 (3d Cir.1998). There must be a final judgment on the nature and extent of the zoning ordinance's impact on the land before constitutional claims arising out of land use decisions are ripe. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1291-92 (3d Cir. 1993). Likewise, for a Fair Housing Act violation regarding land use there must also be a final decision for the claim to be ripe. *See Oxford House-C v. City of St. Louis*, 77 F.3d 249 (8th Cir.1996); *United States v. Village of Palatine, Ill.*, 37 F.3d 1230 (7th Cir.1994).

*Thompson v. Borough of Munhall*, 44 F. App'x 582, 583 (3d Cir. 2002); *Cf. Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Tp. of Scotch Plains*, 284 F.3d 442, 451, n.5 (3d Cir. 2002) (explaining ripeness of FHAA claims); *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 122-24 (2d Cir. 2014).

Under Third Circuit jurisprudence, the "finality rule" does not apply to bar "facial attacks on a zoning ordinance." *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006); *cf. Sunrise*, 769 F.3d at 123. District courts have ruled similarly, finding FHAA claims to be ripe after the local zoning authority has decided the zoning dispute against the plaintiff and permitting facial challenges to go forward, regardless of the status of the local zoning proceedings. *See e.g., Marriott Senior Living Servs., Inc. v. Springfield Twp.*, 78 F. Supp. 2d 376, 385-86 (E.D. Pa. 1999) ("While strict compliance with every local ordinance or regulation is not required ... the applicant must show that under the circumstances it has afforded the appropriate local authority a reasonable opportunity to consider the project in some final form."); *Sharpvisions, Inc.*, 475 F. Supp. 2d at 521-22 (finding FHAA claims ripe after appeal to the Zoning Hearing Board was denied and not requiring it to file for variance or conditional use approval); *Congregation Kollel, Inc. v. Township of Howell, N.J.*, 2017 WL 637689, at *11 (D. N.J. Feb. 16, 2017) (holding that an FHAA claim was ripe "once the Board has allegedly made

the discriminatory decision that Plaintiffs' proposed use is not a permitted use under the Zoning Ordinance" and that the Plaintiffs were not required to apply for a variance).

In this Court's estimation, Cornerstone's disparate treatment claim seeking injunctive relief in the form of a Court order directing Clairton to issue it an occupancy permit is premature and not yet ripe for judicial review. While Cornerstone alleges that Glagola denied its application to use the property as a "single family" residence for discriminatory reasons, Glagola's decision is not final under the Zoning Ordinance, which places the authority to interpret the language of the Zoning Ordinance and to render final decisions squarely with the Zoning Hearing Board. *See Zoning Ordinance* at §§ 337-39; 337-49. Cornerstone admits that it has not pursued an appeal to the Zoning Hearing Board and there has not been a final judgment issued by the local zoning authority articulating the "nature and extent of the zoning ordinance's impact on the land." *Thompson*, 44 F. App'x at 583. Cornerstone has not otherwise demonstrated that this particular claim is ripe for review or that it would be futile for it to pursue the appeal to the Zoning Hearing Board. In fact, the record shows that Cornerstone simply filed this lawsuit rather than submit an appeal and now attempts to avoid the ripeness issue by focusing on its "facial challenge" to the Treatment Center definition, which is further explored below. Accordingly, Cornerstone's claim is subject to dismissal, without prejudice, to the extent that it is construed as seeking injunctive relief arising from Glagola's initial denial of the zoning application.

B. *Rule 12(b)(6) Motion – Failure to State a Claim*

The Court next resolves the main contest between the parties, i.e., whether Cornerstone has stated a plausible claim that the "Treatment Center" ordinance violates the FHAA by facially discriminating against handicapped individuals protected by the law. (Docket Nos. 23; 24; 27;

30). After careful consideration of the parties' arguments, the Court holds that Cornerstone has failed to state a plausible claim for relief against Defendants under this theory. In short, the Court finds that Cornerstone's prospective clients, i.e., recovering drug addicts and alcoholics, are potentially protected by the FHAA but the challenged "Treatment Center" ordinance simply does not expressly discriminate against those individuals.[4]

The Court of Appeals has recognized that:

> [r]egardless of whether plaintiff frames a disparate treatment claim under the FHAA as one alleging discriminatory animus or one alleging a facially discriminatory classification, the most fundamental element of the claim is that plaintiff must demonstrate that defendant's alleged discrimination was "because of a handicap." 42 U.S.C. § 3604(f)(2). This requirement, plainly read from the language of the FHAA, is very often glossed over or, perhaps, so obvious as not worthy of discussion. Here, however, it does not appear to us to be so obvious and thus the focus of our inquiry on this point is whether "handicapped" or "disabled" status-the protected trait under the FHAA-was being used as the *basis* for different treatment.

*Wind Gap Mun. Auth.*, 421 F.3d at 178–79 (emphasis in original) (internal citations and quotations omitted). Thus, the Court must "examine the language of the challenged regulation or policy" against the definition of "handicap" under the Act in order to determine if the "handicap" is the *basis* for different treatment and therefore facially violates the FHAA. *Id.*

In resolving this dispute, the Court is cognizant of several well-settled canons of statutory construction which are likewise applicable to ordinances under Pennsylvania law. "[T]he primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance." *Bailey v. Zoning Bd. of Adjustment of City of Philadelphia*, 569 Pa.

---

[4] The Court notes that "[i]n the [FHAA] context, the issue of 'handicap' is sometimes examined not only by reference to the characteristics of the individuals in question, but also by reference to the criteria for admission to the facility at issue. In other words, an individual can sometimes establish that he or she is 'handicapped' within the meaning of the [FHAA] simply by demonstrating that he or she resides in a facility that only admits 'handicapped' individuals." *McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 822 (W.D. Pa. 2010).

147, 163, 801 A.2d 492, 502 (2002) (citing 1 Pa.C.S. § 1921). "Zoning ordinances are to be construed in accordance with the plain and ordinary meaning of their words," *Upper Salford Twp. v. Collins*, 542 Pa. 608, 612, 669 A.2d 335, 337 (Pa. 1995), and "[w]here the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit," *Bailey*, 569 Pa. at 163 (citing 1 Pa.C.S. § 1903).

> Alternatively, when the words in an ordinance are not explicit, the legislative body's intent may be ascertained by considering, among other things, the ordinance's goal, the consequences of a particular interpretation of the ordinance, and interpretations of the ordinance by an administrative agency. *See* 1 Pa.C.S. § 1921. Furthermore, in determining the proper interpretation of an ordinance, courts and agencies shall also presume that the legislative body "[did] not intend a result that is absurd, impossible of execution or unreasonable." *See* 1 Pa.C.S. § 1922; *County of Allegheny v. Moon Township Municipal Auth.*, 543 Pa. 326, 671 A.2d 662, 666 (1996).

*Bailey*, 569 Pa. at 163–64.

Under Clairton's Zoning Ordinance, a "Treatment Center" is defined as: "[a] use (other than a prison or a hospital) providing housing for three or more unrelated persons who need specialized housing, treatment and/or counseling because of: … Current addiction to a controlled substance that was used in an illegal manner or alcohol." *Zoning Ordinance* at § 337-12. Cornerstone attacks this provision in isolation, suggesting in conclusory fashion that this language places limitations on the number of handicapped persons who can reside in a dwelling and also prevents them from living anywhere within Clairton except an industrial zone. (Docket Nos. 24; 30). Defendants counter that the ordinance covers persons with a "current addiction" to controlled substances or alcohol as opposed to recovering addicts who would inhabit the proposed sober house that Cornerstone has stated it intends to run at the site. (Docket No. 27 at 5, n.1).

It is this Court's opinion that the proper construction of the challenged ordinance is that its language is unambiguous and that the plain and ordinary meaning of same is that the Treatment Center "use" differentiates between individuals with a "current addiction" to controlled substances and those individuals who are in recovery from addiction to controlled substances. The ordinance legislates the housing of the former group of individuals (current addicts who are not covered by the FHAA) but not the latter group (recovering addicts who are potentially covered by the FHAA) and therefore does not run afoul of the FHAA. Cornerstone has also made clear throughout its filings that it represents the latter group. *See e.g., Amended Complaint,* Docket No. 20 at 1 ("The Cornerstone Residence, Inc. […] is a Pennsylvania non-profit corporation established to own and operate supportive residency for men recovering from addiction to alcohol and/or drugs."); *Attachment to Application,* Docket No. 20-1 ("Cornerstone Residency is a sober living residence for men recovering from addiction to alcohol and/or drugs."); *Joyce Douglass Declaration dated 10/5/17,* Docket No. 38-1 at ¶ 20 ("Only those in active recovery with a commitment to this model will qualify for occupancy in the Cornerstone residence").

In this regard, the FHAA defines a "handicap" as:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
> (2) a record of having such an impairment, or
> (3) being regarded as having such an impairment,
> but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21).

42 U.S.C. § 3206(h) (emphasis added). The pertinent regulations clarify that "[t]he term physical or mental impairment includes, but is not limited to, […] drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism." 24 C.F.R. §

100.201.[5]  Construing this language, courts have reasoned that "recovering alcoholics and drug addicts can sometimes qualify as handicapped individuals under the FHA, provided that they are not currently using illegal drugs," <u>and</u> such impairment substantially limits one or more of such person's major life activities. *Lakeside Resort Enterprises, LP v. Bd. of Sup'rs of Palmyra Twp.*, 455 F.3d 154, 156 n. 5 (3d Cir. 2006); *McKivitz v. Twp. of Stowe*, 769 F.Supp.2d 803, 823 (W.D. Pa. 2010) (quoting *Lakeside*); *Human Res. Research & Mgmt. Grp., Inc. v. Cty. of Suffolk*, 687 F. Supp. 2d 237, 252–53 (E.D.N.Y. 2010) ("the statutory language of the Fair Housing Act makes clear that only those recovering from addiction, as opposed to current users, are considered disabled.").  Since individuals with an impairment of "current addiction […] to a controlled substance" are expressly not covered by the FHAA, *see* 42 U.S.C. § 3206(h), a local ordinance such as this one which plainly regulates the housing of individuals with a "[c]urrent addiction to a controlled substance" does not facially violate the FHAA.  To be clear, the prevailing law provides an express *legal distinction* between current addicts and former addicts which differentiates the usage of the term addict by medical or substance abuse treatment providers akin to that described by Cornerstone in its application as "lifelong."  *See e.g., United States v. Southern Mgmt. Corp.*, 955 F.2d 914, 920-21 (4th Cir. 1992) (noting that statutory definition of addiction was distinct from medical definition of same).

---

[5]       The regulations also note that:

> (c) It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person. However, this paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps:
>                                          …
> (4) Inquiring whether an applicant for a dwelling is a current illegal abuser or addict of a controlled substance;
>
> (5) Inquiring whether an applicant has been convicted of the illegal manufacture or distribution of a controlled substance.

24 C.F.R. § 100.202.

Further, the Treatment Center "use" references only a potential *impairment* of drug addiction or alcoholism but an individual may only be deemed handicapped under the FHAA if his/her impairment "substantially limits one or more of such person's major life activities." *Oxford Investments, L.P.*, 21 F. Supp. 3d at 454 ("Drug addiction and alcoholism are both recognized as potential handicaps where the addiction substantially limits a major life activity."). Hence, the protected trait covered by the FHAA, (a physical handicap), is not the *basis* for the different treatment accorded to these groups of individuals by the Zoning Ordinance. *See Wind Gap Mun. Auth.*, 421 F.3d at 178–79. Therefore, Cornerstone has failed to state a plausible facial challenge to this ordinance and its claim must be dismissed.

Alternatively, to the extent that the Treatment Center definition is deemed unclear or ambiguous, it must be construed consistently with the entirety of the legislation, as a whole, and upon doing so, it is clear to this Court that the Zoning Ordinance cannot be deemed to facially violate the FHAA. *Bailey*, 569 Pa. at 163–64. To conclude otherwise would undermine the legislative intent set forth in the Zoning Ordinance and potentially lead to "absurd" results, which this Court is to avoid. *Id.* at 164 (quoting 1 Pa.C.S. § 1922) (courts must presume that the legislative body "[did] not intend a result that is absurd, impossible of execution or unreasonable.")). In particular, the definitions of Group Home and Family set forth in the Zoning Ordinance contain express statements delineating the City's intent to comply with the FHAA. *See Zoning Ordinance* at § 337-12.

To this end, the Group Home "use" states that:

A "Group Home" constitutes the following:

A dwelling unit operated by a responsible individual, family or organization with a program to provide a supportive living arrangement for individuals where special care is needed by the persons served due to age, emotional, mental, developmental or

physical disability. **This definition shall expressly include facilities for the supervised care of persons with disabilities subject to protection under the Federal Fair Housing Act as amended.** Group Homes must be licensed where required by any appropriate government agencies, and a copy of any such license must be delivered to the Zoning Officer prior to the initiation of the use. A Group Home typically involves an individual residing on the premises for more than 30 days at a time.

(a)     Group Homes shall be subject to the same limitations and regulations by the City as the type of dwelling unit they occupy.

(b)     **It is the express intent of the City to comply with all provisions of the Federal Fair Housing Act, as amended, and regulations promulgated thereunder, in the construction of this term.**

(c)     **A Group Home shall not include a "Treatment Center."**

*Zoning Ordinance* at § 337-12 (emphases added). When the Court considers the plain meaning of these words, it reaches a number of conclusions. First, a use involving "[a] dwelling unit operated by [...] [an] organization with a program to provide supportive living arrangement for individuals where special care is needed by the persons served due to [...] physical disability," "expressly include[s] facilities for the supervised care of persons with disabilities subject to protection under the Federal Fair Housing Act as amended." *Id.* Thus, a Group Home "use" includes a facility operated by an organization, such as Cornerstone, providing supervised housing for recovering addicts and alcoholics which, as the Court has discussed above, are subject to protection under the FHAA. Second, a Group Home "use" that meets this definition "shall not include a 'Treatment Center,'" which plainly means that if a "use" constitutes a Group Home under the Zoning Ordinance, then it cannot also be defined as a Treatment Center. *Id.* Third, consistent with Pennsylvania law authority construing zoning ordinances, *see Bailey*, 569 Pa. at 163–64, the definition of Group Home must be construed to comply with the FHAA because the Ordinance states that "it is the express intent" of Clairton to so comply. *Zoning*

*Ordinance* at § 337-12; *see Bailey*, 569 Pa. at 163–64 (citing 1 Pa.C.S. § 1921) ("when the words in an ordinance are not explicit, the legislative body's intent may be ascertained by considering, among other things, the ordinance's goal, the consequences of a particular interpretation of the ordinance, and interpretations of the ordinance by an administrative agency.").

Fourth, a Group Home is "subject to the same limitations and regulations by the City as the type of dwelling unit they occupy," and it appears that the rectory on the Delaware Avenue property is a single family dwelling. *Zoning Ordinance* at § 337-12. The general definition of "family" includes some restrictions on the number of persons that may live in a residence but such definition expressly excludes persons with disabilities from those restrictions. *See id.* ("The foregoing restrictions do not apply to persons with disabilities as defined in the Fair Housing Act, 42 USC § 3601 et seq."). Fifth, the Treatment Center "use" only applies in situations where a Group Home is operating under a restriction on the number of residents but there is no such restriction for a single family dwelling. *Id.* ("[a] use that otherwise meets the definition of a 'group home,' except that it includes a higher number of residents than is allowed in a group home."). Finally, a Group Home is not a "permitted use" under the Zoning Ordinance; rather it is a "conditional use" from which approval must be sought from the Zoning Hearing Board. *See Zoning Ordinance* at Table 301.

All told, the separate definitions of Group Home and Family set forth in the Zoning Ordinance provide significant clarity and force to the Court's determination that the Treatment Center use does not facially violate the FHAA. It is not this Court's role to further interpret the Zoning Ordinance and to rule whether Cornerstone's application should be approved as a single family dwelling, as a group home, or some other use-that is a decision for the Zoning Hearing Board. *See Zoning Ordinance* at § 337-49-(A)-(B). It is enough for this Court to hold that

Cornerstone has failed to state a plausible claim challenging the facial validity of the Treatment Center use definition in the Zoning Ordinance. Accordingly, Defendants' motion to dismiss will be granted.

Lastly, Cornerstone attempts to advance a claim for disparate impact upon conclusory allegations that the same Treatment Center use definition has a disparate impact against all recovering addicts and alcoholics. (Docket No. 20 at ¶¶ 51; 57). It follows inexorably from the Court's conclusion that the challenged ordinance is not facially invalid that this claim must likewise be dismissed. *See Wind Gap Mun. Auth.*, 421 F.3d at 184. In any event, the Court agrees with Defendants that aside from setting forth purely conclusory allegations, which this Court need not credit, Cornerstone has not stated a plausible claim for disparate impact in its Amended Complaint. *See Sztroin v. PennWest Indust. Truck, LLC*, Civ. A. No. 17-665, 2017 WL 4355575, at *8 (W.D. Pa. Oct. 2, 2017) (dismissing disparate impact claim reliant upon conclusory allegations). Given same, Cornerstone's Amended Complaint is also dismissed on this basis.

In sum, Cornerstone has failed to state plausible claims for disparate treatment challenging the facial validity of the Treatment Center use and/or disparate impact resulting from such regulation against Defendants. It has additionally conceded its official capacity claim against Glagola. Defendants' motion to dismiss will therefore be granted. The Court also finds that it would be futile to permit Cornerstone to further amend these claims as the Court has issued a legal ruling construing the Zoning Ordinance against its position in this litigation. *See Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000) (explaining "[a]n amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted"). Hence, the dismissal of these claims is with prejudice.

*C.  Motion for Preliminary Injunction*

Given its analysis dismissing Cornerstone's claims, the Court must deny Cornerstone's motion for a preliminary injunction, as moot, because it is not likely to succeed on the merits of claims which have been dismissed as either unripe for adjudication or failing to state a claim. *See SAPRE*, 2016 WL 4962926, at *14 (denying motion for temporary restraining order/preliminary injunction after dismissing claims).

## V.  CONCLUSION

Based on the foregoing, Defendants' motion to dismiss is granted and Plaintiff's Amended Complaint is dismissed.  Plaintiff's motion for preliminary injunction is therefore denied, as moot.  An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
U.S. District Judge

Dated: November 8, 2017

cc/ecf: All counsel of record.